**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PLATA CAPITAL LIMITED,

Plaintiffs-Counterclaim-Defendants,

-v-

FINANCIAL TECHNOLOGY PARTNERS LP and FTP SECURITIES LLC,

Defendants-Counterclaim-Plaintiffs.

FINANCIAL TECHNOLOGY PARTNERS L.P. and FTP SECURITIES LLC,

Counterclaim-Plaintiffs,
-v-

FINTECH ACQUISITION LIMITED and NORTH HAVEN EXPANSION EQUITY IX LP,

Counterclaim Defendants.

Civil Action No. 1:25-cv-02549-PAE

Hon. Paul A. Engelmayer

**ORAL ARGUMENT REQUESTED**

**FINANCIAL TECHNOLOGY PARTNERS L.P. AND FTP SECURITIES LLC'S MEMORANDUM OF LAW IN OPPOSITION TO NORTH HAVEN EXPANSION EQUITY IX LP'S MOTION TO DISMISS COUNTERCLAIMS**

## TABLE OF CONTENTS


Preliminary Statement ........ 1

Background ........ 3

Argument ........ 8

I. FT Partners States A Claim For Tortious Interference With Contract. ........ 8

A. FT Partners Adequately Alleges That North Haven Intentionally Procured Plata's Breach Of The Engagement Letter Without Justification. ........ 8

1. North Haven Procured Plata's Breach ........ 8

2. North Haven's BHCA Argument Misstates The Pleading And Cannot Be Resolved On A Motion to Dismiss ........ 12

B. FT Partners Sufficiently Alleges Damages From North Haven's Interference. ........ 14

C. The Economic Interest Defense Does Not Apply, And In Any Event Cannot Be Resolved On This Motion To Dismiss. ........ 16

II. The Amended Counterclaims State A Claim For Unjust Enrichment. ........ 22

III. North Haven's Jurisdictional Argument Is Meritless and Moot. ........ 24

Conclusion ........ 25

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC*,
No. 19 Civ. 8760 (LGS), 2020 WL 5259283 (S.D.N.Y. Sept. 3, 2020)................................ 16

*American Water Enterprises Inc. v. Tectura Corp.*,
No. 654459/2013, 2014 WL 3885953 (Sup. Ct. N.Y. C'ty Aug. 4, 2014)................ 18, 19, 20

*Bank of New York Mellon, London Branch v. Cart 1, Ltd.*,
No. 18 Civ. 6093 (JPO), 2021 WL 2358695 (S.D.N.Y. June 9, 2021) ................................ 20

*Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*,
259 F. Supp. 3d 16 (S.D.N.Y. 2017) ........................................................................... 20

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*,
448 F.3d 573 (2d Cir. 2006) .................................................................................... 22

*Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*,
10 N.Y.3d 187 (2008)........................................................................................ 15, 16

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ...................................................................................... 5

*Chestnut Hill Partners, LLC v. Van Raalte*,
847 N.Y.S.2d 18 (1st Dep't 2007)............................................................................. 23

*Don King Prods., Inc. v. Smith*,
47 F. App'x 12 (2d Cir. 2002) ................................................................................. 20

*Ford Motor Credit Co. LLC v. McCarthy Acquisition Corp.*,
192 N.Y.S.3d 830 (1st Dep't 2023)........................................................................... 15

*GCA Advisors, LLC v. Onion, Inc.*,
2019 WL 3526119 (Sup. Ct. N.Y. C'ty Aug. 02, 2019)...................................................... 14

*Ghost in the Mach. Inc. v. Planned Parenthood Fed'n of Am., Inc.*,
No. 22 Civ. 9270 (VSB), 2025 WL 252913 (S.D.N.Y. Jan. 21, 2025) ................................ 22

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
50 N.Y.2d 183 (1980)................................................................................................ 15

*Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*,
No. 11 Civ. 5832 (AJN), 2012 WL 3542196 (S.D.N.Y. Aug. 15, 2012)........................ 17, 21

*In re Enron Corp.*,
No. 02 Civ. 5638 (BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003)........ 24

*Kantamneni v. United States Dep't of Homeland Sec.*,
No. 23 Civ. 6453 (PGG), 2025 WL 2774088 (S.D.N.Y. Sept. 29, 2025)........ 8, 22

*Lama Holding Co. v. Smith Barney Inc.*,
668 N.E.2d 1370 (N.Y. 1996)........ 8

*Lee v. Kylin Mgmt. LLC*,
No. 17 Civ. 7249 (JMF), 2019 WL 917097 (S.D.N.Y. Feb. 25, 2019)........ 23

*Manhattan Chrystie St. Dev. Fund, LLC v. 215 Chrystie Invs. LLC*,
212 N.Y.S.3d 598 (1st Dep't 2024)........ 23

*Matthews v. Symbion Power LLC*,
130 N.Y.S.3d 246 (Sup. Ct. N.Y. C'ty 2020)........ 23

*Mosdos, Chofetz Chaim, Inc. v. Village of Wesley Hills*,
815 F. Supp. 2d 679 (S.D.N.Y. 2011)........ 5

*MRS Realty Co. v. Higbee*,
497 N.Y.S.2d 221 (Sup. Ct. N.Y. C'ty 1985)........ 14

*Natale v. Beth Israel Med. Ctr.*,
No. 14 Civ. 2844 (LLS), 2014 WL 5374349 (S.D.N.Y. Oct. 10, 2014)........ 18, 19, 20

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
664 N.E.2d 492 (1996)........ 14, 19, 20

*Normandy Real Est. Partners LLC v. 24 E. 12th St. Assocs. LLC*,
92 N.Y.S.3d 207 (1st Dep't 2019)........ 17, 18, 19

*Rich v. Fox News Network, LLC*,
939 F.3d 112 (2d Cir. 2019)........ 14

*TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.*,
No. 19 Civ. 3283 (DLC), 2020 WL 1322872 (S.D.N.Y. Mar. 20, 2020)........ 22

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*,
No. 18 Civ. 4044 (VM), 2019 WL 4744220 (S.D.N.Y. Aug. 26, 2019)........ 20

*V.S. v. Muhammad*,
595 F.3d 426 (2d Cir. 2010)........ 18

*VR Optics, LLC v. Peloton Interactive, Inc.*,
No. 16 Civ. 6392 (JPO), 2017 WL 3600427 (S.D.N.Y. Aug. 18, 2017)........ 17

*Weyant v. Phia Grp. LLP*,
No. 17 Civ. 8230 (LGS), 2021 WL 5998400 (S.D.N.Y. Dec. 20, 2021) ........................ 22, 23

*White Plains Coat & Apron Co. v. Cintas Corp.*,
8 N.Y.3d 422 (2007) ........................................................................................ 17, 18, 19

*Wiener v. Lazard Freres & Co.*,
672 N.Y.S.2d 8 (1st Dep't 1998) ........................................................................... 24

*Wolff & Munier, Inc. v. New York City Sch. Const. Auth.*,
639 N.Y.S.2d 429 (2d Dep't 1996) ......................................................................... 14

**Statutes and Regulations**

21 NYCRR § 9600.4 .................................................................................................. 14

28 U.S.C. § 1367(c)(4) ............................................................................................ 24

Defendants-Counterclaim-Plaintiffs Financial Technology Partners L.P. and FTP Securities LLC (collectively, "FT Partners") respectfully submit this memorandum of law in opposition to North Haven Expansion Equity IX LP's ("North Haven") motion to dismiss FT Partners' counterclaims against it (the "Motion") (Dkt. No. 133).[1]

## PRELIMINARY STATEMENT

When North Haven discovered that Plata's Engagement Letter with FT Partners required Plata to pay fees on future capital raises, North Haven delivered an ultimatum to Plata: make the Engagement Letter with FT Partners go away, or else North Haven would abandon its contemplated investment in Plata. When Plata rejected that demand, North Haven instead hatched a plan to evade Plata's obligations and pitched it to Plata. North Haven's idea was to structure its anticipated minority investment in Plata so that it would appear to be a "Company Sale" under the Engagement Letter, which would purport to terminate the agreement and eliminate the obligation to pay fees on future transactions. Plata agreed and, together with North Haven, proceeded to execute this plan, even though it was a wrongful (and invalid) termination and a breach of the Engagement Letter's express prohibition on attempts to circumvent the agreement by structuring a transaction to avoid paying transaction fees. As a result, Plata has already failed to pay fees in accordance with the Engagement Letter and will continue to withhold future fees absent judicial intervention. The Counterclaims' detailed factual allegations describing this conduct require denial of the Motion.

---

1 Citations to "ACC ¶ __" are to FT Partners' Amended Answer and Counterclaims (the "Counterclaims"). (Dkt. Nos. 116 (redacted version), 117 (sealed, unredacted version).) Exhibit citations ("Ex. __") are to the Declaration of Jed I. Bergman, dated May 18, 2026 and filed contemporaneously herewith. Unless otherwise noted, all capitalized words and terms refer to the definitions provided in the Counterclaims, alterations are accepted, internal quotation marks are omitted, and all emphases are added.

North Haven's inducement of these breaches is textbook tortious interference with contract, and its attempts to argue otherwise are unavailing.

First, North Haven argues that it had to structure its investment as a "Company Sale" to comply with the Bank Holding Company Act, and that was its actual motivation for this structure. This contention is false and belied by the Counterclaims' factual allegations. Its ultimate adjudication will also require document discovery, testimony from fact witnesses, and potentially expert testimony regarding the requirements and applicability of the Bank Holding Company Act. This defense is thus unsupported and not properly entertained on this motion, which is limited to addressing the sufficiency of the pleading.

Second, North Haven suggests that FT Partners does not sufficiently allege damages resulting from its inducement of Plata's breach. But North Haven acknowledges that Plata has already withheld fees that it was required to pay under the Engagement Letter. Moreover, as alleged in the Counterclaims and supported by contemporaneous documentation, North Haven's reason for its misconduct was to avoid future fees, which are likely to be substantial. This motivation belies North Haven's suggestion that cutting off those future fees is not a cognizable harm.

Third, North Haven contends that it had an economic interest in Plata that excused its tortious interference. But that affirmative defense does not appear on the face of the pleading, and is not a basis for dismissal. In fact, at the time North Haven induced Plata's breaches, North Haven did not have a qualifying economic interest at all. It had only a "Summary of Proposed Terms" outlining its intent to pursue a potential minority investment. The term sheet was expressly non-binding and made clear that the parties could walk away from the contemplated investment at any time and for any reason – as North Haven eventually threatened to do, unless

Plata "cleanse[d]" the FT Partners Engagement Letter. That mere expectancy is not the sort of economic interest protected by New York law.

FT Partners has also properly pled a claim for unjust enrichment. FT Partners introduced North Haven to Plata and secured this lucrative investment opportunity for North Haven. North Haven's efforts to retain the benefits of that opportunity while depriving FT Partners of the fees it is owed arising out of this relationship are improper and actionable.

Finally, North Haven suggests that the Court should refuse to exercise supplemental jurisdiction, simply because initial counsel for FT Partners, Latham & Watkins LLP ("Latham"), brought in conflicts counsel while continuing to play an active role in the case solely against Plata and FAL HoldCo. This attack on a standard circumstance is frivolous. Nevertheless, to promote efficiency and avoid any further distraction, Latham is withdrawing from the case contemporaneously with this filing—thereby mooting the premise of North Haven's jurisdictional argument.

For these reasons, and as further discussed below, North Haven's motion to dismiss should be denied.

## BACKGROUND

FT Partners is a financial advisory firm that entered into the Engagement Letter with Plata in April 2023 to serve as its "exclusive financial and strategic advisor" in connection with capital-raising transactions. ACC ¶ 79. Pursuant to the Engagement Letter, FT Partners was entitled to Transaction Fees on a "Capital Raise" and "Company Sale" (as those terms are defined in the Engagement Letter) regardless of whether Plata opted to use FT Partners' services on any particular transaction. ACC ¶ 83. The Engagement Letter expressly prohibits Plata from

undertaking a "corporate reorganization or similar transaction to avoid paying a Transaction Fee that would otherwise be due hereunder." ACC ¶ 88.

The Engagement Letter further provides that "FT Partners will be the Company's long-term financial and strategic advisor until consummation of a Company Sale," and permits termination only in three limited circumstances: "(i) mutual written agreement by FT Partners and [Plata], in their respective sole discretion, to terminate this letter agreement, (ii) FT Partners provides to [Plata] written notice of termination of this letter agreement, and (iii) consummation of a Company Sale." ACC ¶ 90.

Between April 2023 and June 2024, FT Partners undertook a capital raise at Plata's behest and on its behalf, seeking to raise funds either through the sale of a minority equity stake in the company or through debt financing. ACC ¶¶ 96-97. During this process, Plata's CEO, Vroon Modgill, made clear that his objective was to raise capital to fund his plans to grow the business—but not to sell the company or otherwise to relinquish control in the immediate future. ACC ¶ 97. FT Partners successfully generated interest from several potential minority investors in Plata, including North Haven, a fund associated with Morgan Stanley Expansion Capital. ACC ¶ 99.

On behalf of Plata, FT Partners had numerous calls with North Haven throughout December 2023. During those discussions, FT Partners informed North Haven of the terms of the Engagement Letter, including Plata's obligation to continue to pay Transaction Fees through the eventual occurrence of a Company Sale. ACC ¶¶ 102-03. North Haven proposed investment terms during this period, including a December 14, 2023 proposal in which North Haven valued the business at $55 million, and sought to make a minority investment of $20 million. ACC ¶¶ 101-02.

North Haven ultimately signed a "Summary of Proposed Terms" on January 12, 2024 (the "Term Sheet," attached as Exhibit A).[2] The Term Sheet made clear that [redacted] Ex. A at 1. Underscoring this point, the Term Sheet contemplated [redacted] ACC ¶ 104; Ex. A at 2.

The Term Sheet also provided for FT Partners to continue playing the ongoing role contemplated by the Engagement Letter, expressly stating that any company sale process five years after North Haven's proposed investment would "[redacted] ACC ¶ 104; Ex. A at 2.

The final paragraph of the Term Sheet made clear that, [redacted] Ex. A at 7.

---

[2] On a motion to dismiss, the Court may consider "any written instrument attached to [the pleadings] as an exhibit or any statements or documents incorporated in or by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). A document is incorporated by reference if the pleading "make[s] a clear, definite and substantial reference" to it. *Mosdos, Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011). Here, the Term Sheet is undoubtedly incorporated by reference into the Counterclaims, which refers to it several dozen times. *See, e.g.*, ACC ¶¶ 56-57, 102-13, 304, 312.

Even the Term Sheet's limited exclusivity provision was terminable at will. [redacted] Ex. A at 6. It also stated that [redacted] *See* ACC ¶¶ 105-06; Ex. A at 6.

Despite the Term Sheet's explicit references to FT Partners' continued role, just a few weeks after the Term Sheet was signed, North Haven started working to cut FT Partners out of the loop. ACC ¶ 111. For example, in a February 14, 2024 email among North Haven personnel after FT Partners proposed a call to discuss the plan for closing, North Haven made clear that they would "just ignore" FT Partners. *Id.* Then, in mid-February, North Haven's outside counsel requested a copy of the Engagement Letter from Plata's outside counsel. ACC ¶ 112. Upon receipt, North Haven scrutinized the Engagement Letter and concluded that the term of FT Partners' engagement with Plata was "effectively indefinite." ACC ¶ 113. After that, FT Partners' ongoing role – and Plata's concordant obligation to pay Transaction Fees – suddenly became a major issue for North Haven, even though the Engagement Letter and Term Sheet both provided for FT Partners' continuing involvement after North Haven closed its proposed investment. ACC ¶ 113.

By early March 2024, the issue came to a head. ACC ¶ 115. According to contemporaneous notes of a follow-up call between Modgill and FT Partners, Lincoln Isetta of

North Haven informed Modgill that the Engagement Letter "needs to be cancelled simultaneously to closing." *Id.* North Haven further threatened to withhold its investment unless Plata went along with its scheme, and issued an ultimatum, stating that North Haven "won't invest unless the FT contract goes away." *Id.* Although North Haven convinced Plata to proceed while keeping FT Partners sidelined, FT Partners refused to cave to North Haven's unlawful interference in FT Partners' contract with Plata and did not consent to termination. ACC ¶ 116.

Unable to induce the cancellation of the Engagement Letter directly, North Haven pivoted to an alternative scheme to trigger a purported termination of the Engagement Letter, and thus avoid Plata's obligation to pay future Transaction Fees that would otherwise be due. Abandoning the transaction structure contemplated by the Term Sheet, North Haven's scheme was to restructure its minority investment into what it intended to claim was a "Company Sale," thus triggering a purported termination of the Engagement Letter. ACC ¶ 125. North Haven "coordinated calls with Plata and its counsel 'on the restructuring of the deal," pitching this scheme to Plata as a way to "cleans[e] the FT issue," and successfully persuaded Plata to proceed with it, despite anticipating that FT Partners might respond to this scheme by enforcing its rights through litigation. ACC ¶¶ 125, 131. As a result, Plata has taken the position that the Engagement Letter is terminated, brought this lawsuit, and refused to pay FT Partners fees to which it is entitled under the Engagement Letter, including fees arising from a subsequent transaction with Kreos Capital and fees that will be owed on future capital raises. ACC ¶¶ 226-32.

On March 17, 2026, FT Partners amended its counterclaims. Dkt. No. 116. North Haven moved to dismiss the Amended Counterclaims on April 17, 2026. Dkt. Nos. 133-34.

## ARGUMENT

### I. <u>FT Partners States A Claim For Tortious Interference With Contract.</u>

"Tortious interference with contract requires [1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996). As pled in the Counterclaims, FT Partners' claim against North Haven for tortious interference with the Engagement Letter readily satisfies each element.

#### A. FT Partners Adequately Alleges That North Haven Intentionally Procured Plata's Breach Of The Engagement Letter Without Justification.

1. <u>North Haven Procured Plata's Breach.</u>

North Haven does not dispute that the Engagement Letter is a valid contract of which it had knowledge.[3] And North Haven's motion acknowledges, as it must, that FT Partners "alleges that North Haven procured Plata's breach" of the non-circumvention provision. Mot. at 14. In fact, the Counterclaims contain detailed allegations supporting North Haven's procurement of Plata's breach, including that North Haven "threaten[ed] to abandon its investment in Plata unless Plata secured FT Partners' agreement to terminate the Engagement Letter" (ACC ¶ 305); that North Haven's Isetta told Plata's Modgill that the Engagement Letter "needs to be cancelled simultaneously to closing," and that North Haven "won't invest unless the FT contract goes

---

[3] Because North Haven does not challenge (1) the existence of a valid contract between FT Partners and Plata, or (2) North Haven's knowledge of that contract, it has waived any argument as to those two elements. *Kantamneni v. United States Dep't of Homeland Sec.*, No. 23 Civ. 6453 (PGG), 2025 WL 2774088, at *8 (S.D.N.Y. Sept. 29, 2025) (noting that arguments not raised in an opening brief will not be considered).

away" (ACC ¶ 115); and that when FT Partners refused to back down from its agreement, North Haven increased the pressure campaign, with transactional counsel working to paper the transaction while agreeing to keep FT Partners in the dark (ACC ¶ 122).

With its efforts to outright cancel the Engagement Letter stymied, North Haven (and its counsel) concocted, spearheaded, and carried out a sham deal structure with Plata that the parties would claim triggered termination of the Engagement Letter by purporting to be a "Company Sale." As the Counterclaims allege in detail, it was not a Company Sale, and Plata's wrongful assertion of a Company Sale and termination bid breached the Engagement Letter. ACC ¶¶ 139-66. This attempt to circumvent the obligation to pay future fees under the "effectively indefinite" Engagement Letter by ginning up a sham Company Sale also breached Section 10 of the Engagement Letter, which expressly prohibits Plata from undertaking this very conduct: a "corporate reorganization or similar transaction to avoid paying a Transaction Fee that would otherwise be due hereunder." ACC ¶¶ 305, 306.

As further evidence that Plata and North Haven sought to circumvent the Engagement Letter, Plata initially claimed a Company Sale had occurred because a majority of Plata's equity was sold to new investors, including a "Redacted Investor Group." ACC ¶ 147. As alleged in the Counterclaims, however, discovery has revealed that Plata misrepresented that a majority of its equity was sold. ACC ¶¶ 148-53. Eventually, Plata realized it could not claim a Company Sale on this basis, so it reverted to the equally dubious claim that Plata was "sold" to FAL HoldCo through a share-for-share exchange where FAL HoldCo acquired all shares of Plata, the net effect of which was merely to transfer the stock of Plata into a holding company (*i.e.*, a mere "reorganization" that expressly cannot function to terminate the Engagement Letter under Section 10). ACC ¶¶ 143-44, 159-61, 181. That argument is even more tenuous in light of the

Engagement Letter's provision that "[t]he provisions of this letter agreement shall be binding upon the Company and its affiliates and subsidiaries and their successors and assigns"—meaning, the mere transfer of Plata's shares to FAL HoldCo does not function to terminate the contract altogether. ACC ¶ 181.[4]

Despite these extensive allegations of breach, North Haven argues that Plata's conduct was not actually a breach because Plata *did* end up owing a Transaction Fee for the purported Company Sale. In particular, it argues that "North Haven's Transaction structure resulted in FT Partners' entitlement to a greater fee than if the Transaction was characterized as a Capital Raise," and the new structure therefore "did not 'avoid paying a Transaction Fee that would otherwise be due hereunder.'" Mot. at 14.

But the size of a single Transaction Fee is a distraction. The entire point of North Haven's interference was to secure a purported termination of the Engagement Letter and thereby *avoid paying all future Transaction Fees that would otherwise be due thereunder*. The Engagement Letter was explicitly an "arrangement that is long-term in nature," and Plata had acknowledged that FT Partners was "committing its limited resources towards the long-term growth of [Plata] over many years and would not enter into this letter agreement but for the long-term nature of the commitment." ACC ¶¶ 83, 90 (quoting Engagement Letter §§ 6, 9). As North Haven admits in the Motion, those long-term fees are exactly what it was trying to avoid paying through its interference: its "motivation in wanting the Engagement Letter terminated was [to

---

[4] Plata also claimed that the Engagement Letter was terminated as a result of a transfer of control of Plata's Board of Directors. But this argument is just as disingenuous, as Vroon Modgill retains control of the Boards of Directors of both FAL HoldCo and Plata. ACC ¶ 186-90. The fact that Plata has raised this as a basis for termination only further demonstrates its intent to circumvent the Engagement Letter.

cut off] the 'long-term obligations' of Plata and the 'effectively indefinite' nature of the contract." Mot. at 11-12. North Haven's interference – if left unremedied – would improperly deprive FT Partners of all future Transaction Fees. That is the breach. *See* ACC ¶¶ 112-138.

North Haven's argument also ignores the fact that to date, Plata has not paid FT Partners *any* Transaction Fee for the transaction at issue (or accrued interest, for that matter). Rather, Plata improperly conditioned any such payment, insisting that it would pay the amounts owed "*only* if FT Partners would sign a termination agreement acknowledging that the Engagement Letter was terminated on the date the North Haven Transaction was completed, and threatened to sue FT Partners if it did not sign." ACC ¶ 165. In other words, North Haven's interference has resulted in Plata's not even paying the Transaction Fee that it claims to owe – which even North Haven concedes FT Partners is "entitle[d]" to be paid under the Engagement Letter (Mot. at 14).

North Haven alternatively argues that the allegation that "North Haven's structure resulted in the termination of the Engagement Letter" was not a breach – rather, it is "an allegation of compliance with contract – *i.e.*, if a certain type of transaction occurs, the Engagement Letter is terminated." Mot. at 14. But again, North Haven is deliberately missing the forest for the trees: what the Amended Counterclaims allege is that North Haven intentionally procured from Plata a reorganization structured in a manner forbidden by the Engagement Letter—*i.e.*, a "reorganization or similar transaction to avoid paying fees" —to pretextually avoid paying all future fees based on that sham "Company Sale." ACC ¶ 65. That was a breach. And of course, North Haven is also ignoring FT Partners' allegations that the

reorganization was *not* a Company Sale, and that Plata's purported termination was itself a breach. ACC ¶¶ 58-64. That breach, too, was induced by North Haven.[5]

2. North Haven's BHCA Argument Misstates The Pleading And Cannot Be Resolved On A Motion to Dismiss.

North Haven also contends that all of its alleged misconduct was proper because it was "required to structure the Transaction in a manner that was compliant with the Bank Holding Company Act." Mot. at 13.[6] North Haven's reliance on its purported compliance with the Bank Holding Company Act ("BHCA") mischaracterizes the Counterclaims and, in any event, is improper on a motion to dismiss.

As an initial matter, North Haven's contention that it was "*required* to structure the Transaction in a manner that was compliant with the Bank Holding Company Act" is a defense, not a fact alleged in the Amended Counterclaims. If that is North Haven's position, it will have to establish it through documentary evidence, testimony, and potentially expert testimony—all of which is beyond the four corners of the pleading. These are precisely the kinds of factual disputes that cannot be resolved on a motion to dismiss, prior to the discovery that will permit FT

---

[5] North Haven procured additional breaches as well, including Plata's breach of Section 7(a) of the Engagement Letter, by which Plata agreed to "promptly advise FT Partners of all developments materially affecting the Company or any proposed Transaction." *See* ACC ¶¶ 262-70. And as a result of North Haven's "pressure campaign" to get rid of FT Partners, Plata (a) agreed to keep FT Partners in the dark and "fail[ed] to timely inform FT Partners of material changes to plans for the North Haven Transaction before they occurred," ACC ¶¶ 122, 267; (b) refused to provide FT Partners a complete set of financial documents pursuant to its explicit right to such information, instead offering only a single Share Exchange Agreement, refusing to provide an unredacted capitalization table, and ignoring FT Partners' requests for additional documents for months, ACC ¶¶ 142, 146-58; and (c) issued a press release that breached Section 9 of the Engagement Letter because it failed to reference FT Partners' role in the Transaction, ACC ¶ 185.

[6] North Haven also argues that it acted properly in furtherance of its legitimate economic interests in Plata. That argument is misplaced for the reasons stated *infra* at § I.C.

Partners to test North Haven's self-serving contention that its actions were motivated wholly by regulatory compliance rather than its admitted desire to terminate the Engagement Letter.

Although North Haven cites paragraph 127 from the Counterclaims to suggest that its BHCA defense is within the four corners of the pleading (Mot. at 13), that paragraph does not address North Haven's motivation, let alone the *bona fides* of its BHCA rationale. Paragraph 127 simply quotes from a North Haven investment-committee memo stating that the proposed investment would be "structured as a Bank Holding Company Act ('BHCA') compliant acquisition and Series A financing." *Nowhere* in the Counterclaims is there an allegation that North Haven's *motivation* for the structure of the Transaction was to comply with the Bank Holding Company Act, let alone that the Transaction's structure was dictated by the BHCA.

To the contrary, paragraph 127 also quotes North Haven's memo touting that the proposed transaction would also "result in the termination of FT Partners' current engagement letter" – which, as FT Partners alleges, "illuminat[es] the true motivation behind the structure." ACC ¶ 127. The Counterclaims thus allege that North Haven's goal was to structure a deal to get rid of future fee obligations that Plata would otherwise owe to FT Partners. As the full record will show, the BHCA fig leaf was a retroactive excuse that came only later, materially after North Haven started plotting to cut out FT Partners. On this motion, the truth of *FT Partners'* allegations is assumed, and North Haven's attempt to present an alternate narrative at this stage—one that FT Partners is confident will ultimately be disproven by the broader record—should be rejected.

Finally, North Haven's argument that "[t]he fact that a BHCA-compliant structure also resulted in the termination of the Engagement Letter does not make the structure improper" (Mot. at 13) gets things backwards. Compliance with the BHCA does not make the structure

proper, and does not immunize North Haven from the consequences of its tortious interference. Even if North Haven's structure complied with the BHCA (which is not alleged, and which FT Partners does not concede), and even if that was one of the reasons North Haven chose that particular structure (which is another disputed issue of fact), it is well-settled that a "plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 496 (1996). So "lawful behavior, by itself, does not suffice to justify tortious interference." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 129 (2d Cir. 2019). Any other approach would render tortious interference a dead letter, as the tortfeasor can invariably point to some law with which its action complied.[7]

**B. FT Partners Sufficiently Alleges Damages From North Haven's Interference.**

North Haven induced Plata's breach for the express purpose of avoiding future fees that would otherwise have been owed under the Engagement Letter, and Plata's failure to pay these fees in breach of the Engagement Letter—including a fee from at least one transaction that is already due and owing—constitutes cognizable damages. North Haven's arguments to the contrary (Mot. at 15) are unavailing.

---

[7] None of North Haven's cases suggests otherwise. *Wolff & Munier, Inc. v. New York City Sch. Const. Auth.*, involved a specific statutory authorization to terminate dubious contractors by an entity "created by the New York State Legislature in large part to address corruption in the construction industry." 639 N.Y.S.2d 429 (2d Dep't 1996) (citing 21 NYCRR § 9600.4). *MRS Realty Co. v. Higbee,* is not even a tortious interference with contract case. Rather, it is a four-decade-old trial court case about "intentional infliction of economic harm." 497 N.Y.S.2d 221 (Sup. Ct. N.Y. C'ty 1985). It includes no commentary (let alone a ruling) on tortious interference with contract. *GCA Advisors, LLC v. Onion, Inc.*, likewise does not address whether compliance with a given law is a defense to tortious interference. No. 653989/2018, 2019 WL 3526119, at *2 (Sup. Ct. N.Y. C'ty Aug. 2, 2019).

"The successful party on a tortious interference claim is entitled to the full pecuniary loss of the benefits of the contract with which the defendant interfered, including lost profits." *Ford Motor Credit Co. LLC v. McCarthy Acquisition Corp.*, 192 N.Y.S.3d 830, 835 (1st Dep't 2023). In a tortious interference action, "the elements of damages, including consequential damages, would be those recognized under the more liberal rules applicable to tort actions." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 197 n.6 (1980). "Consequential damages, designed to compensate a party for reasonably foreseeable damages, must be proximately caused by the breach." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 193 (2008).

Here, the Counterclaims specifically allege damages as a result of North Haven's tortious interference, including the unpaid Transaction Fee owed for the North Haven Transaction (ACC ¶ 257), the unpaid Transaction Fee owed on the $15,000,000 raised in the Kreos Transaction (ACC ¶ 221), and the loss of fees from future Capital Raises and a true future Company Sale (not the sham reorganization that occurred here). [redacted]

In fact, the Motion concedes that FT Partners alleges damages. Buried in a footnote, North Haven admits that "FT Partners also alleges that Plata owes it a fee for a transaction involving Kreos Capital." Mot. at 15 n.6 (citing ACC ¶¶ 198-200). It subsequently attempts to sidestep that admission by stating that FT Partners does not allege "that North Haven was involved with either the Kreos transaction or Plata's decision whether to pay a fee on the Kreos transaction." *Id.* That, however, is a non sequitur. FT Partners' damages are the benefits of the contract North Haven schemed to have Plata breach. There is no requirement (and North Haven

does not suggest otherwise) that North Haven have a direct role in the specific damages. All that is required is that such damages be "reasonably foreseeable." *Bi-Econ. Mkt., Inc.*, 10 N.Y.3d at 196. Here, it was reasonably foreseeable that Plata would refuse to pay FT Partners any Transaction Fees after purporting to terminate the Engagement Letter. That was exactly the reason North Haven schemed to procure the breach in the first place. ACC ¶¶ 110, 113; Mot. at 11-12.[8] Nor were these fees speculative. They were concrete enough that North Haven was willing to procure Plata's breach or walk away from its investment to evade them. *See* ACC ¶¶ 112-38.

### C. The Economic Interest Defense Does Not Apply, And In Any Event Cannot Be Resolved On This Motion To Dismiss.

North Haven contends that its tortious interference is nevertheless excused by the economic interest defense, ostensibly because its entry into the "Summary of Proposed Terms" with Plata in January 2024 created "an obvious economic interest in Plata's affairs." Mot. at 8-9. Not so. Binding caselaw in this Circuit makes clear that the economic interest defense does not apply to the allegations here.

As a threshold matter, the economic interest defense is an affirmative defense "which several courts in the Second Circuit have refused to consider at the pleading stage," and even when considered on a motion to dismiss, the defense must "appear[] on the face" of the pleading for the Court to accept it. *360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC*, No. 19 Civ. 8760

[8] North Haven's concession on the Kreos Transaction undermines its claim that future damages are "speculative" here. Mot. at 16 n.7. At least one set of lost Transaction Fees has already accrued. And, while the Court need not decide the amount of damages at this juncture, the Counterclaims further note that North Haven's own valuation documents suggest that a legitimate future Company Sale could yield FT Partners more than [redacted] in fees, ACC ¶ 224—far more than what it would have received in this sham sale.

(LGS), 2020 WL 5259283, at *5 (S.D.N.Y. Sept. 3, 2020); *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16 Civ. 6392 (JPO), 2017 WL 3600427, at *6 (S.D.N.Y. Aug. 18, 2017) (refusing to dismiss tortious interference claim based on economic interest defense where pleadings "do not, as a matter of law," establish entitlement to defense); *Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, No. 11 Civ. 5832 (AJN), 2012 WL 3542196, at *9 (S.D.N.Y. Aug. 15, 2012) (collecting cases). North Haven agrees that addressing this defense at the pleading stage is only appropriate where it "appears on the face of the pleading." Mot. at 8.

North Haven cannot meet its burden of establishing this affirmative defense, and it certainly cannot do so on the face of the pleadings. The economic interest defense is available only where a third party "acts to protect its own legal or financial stake in the breaching party's business." *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007). The legal or financial stake must pre-date the tortious interference to serve as justification. *Normandy Real Est. Partners LLC v. 24 E. 12th St. Assocs. LLC*, 92 N.Y.S.3d 207, 210 (1st Dep't 2019) (rejecting economic interest defense where, among other factors, tortfeasor "did not appear to have a *prior* contractual or economic relationship."); *see also White Plains*, 8 N.Y.3d at 425 (answering in negative certified question as to availability of economic-interest defense "for an alleged tortfeasor with no *previous* economic relationship with the breaching party").

Here, North Haven had no existing "legal or financial stake" in Plata at the time of its tortious interference. [redacted]

[redacted]

[redacted]

[redacted]

The unrealized expectancy of a possible minority investment contemplated by the Term Sheet did not give North Haven a present legal or financial stake in Plata. And the fact that North Haven subsequently invested in Plata – *after* the tortious interference – does not retroactively grant North Haven a financial stake in Plata's business before, or during, the interference.

North Haven tries to skirt the issue by relying on two cases in which it contends the interfering party's financial stake was finalized after the interference: *Natale v. Beth Israel Med. Ctr.*, No. 14 Civ. 2844 (LLS), 2014 WL 5374349 (S.D.N.Y. Oct. 10, 2014), and *American Water Enterprises Inc. v. Tectura Corp.*, No. 654459/2013, 2014 WL 3885953 (Sup. Ct. N.Y. C'ty Aug. 4, 2014). That reliance is misplaced. More recent, binding New York caselaw – including the First Department's 2019 decision in *Normandy* – affirms the reasoning of *White Plains* and establishes that the tortfeasor must have a "*prior* contractual or economic relationship" at the time of interference to invoke the economic interest defense. *Normandy Real Est. Partners LLC*, 92 N.Y.S.3d at 210.[9] There must already be a "legal or financial stake in the breaching party's business," such as "where defendants were significant stockholders in the breaching party's

---

[9] Federal courts are "bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion." *V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010).

business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff." *White Plains*, 8 N.Y.3d at 426 (cited by *Normandy Real Est. Partners LLC*, 92 N.Y.S.3d at 210).

That conclusion is consistent with well-established principles of New York law affording lesser levels of protection to contingent and unrealized economic interests, even when those interests are documented in writing. *See, e.g., NBT Bancorp Inc.*, 664 N.E.2d at 496-97 ("The right NBT seeks to protect here—its expectation that Central Bank's stockholders would approve the Merger Agreement—is thus not entitled to the same protection that would have been accorded a legally enforceable right to performance under that agreement."); *see also White Plains*, 8 N.Y.3d at 426 (explaining that a generic competitor's interest "is not equal to that of" a plaintiff with a binding contract); *Normandy*, 92 N.Y.S.3d at 210 (contrasting "prior contractual or economic relationship" with "merely a generalized economic interest"). Just as a plaintiff with a mere expectation of performance cannot sue another for tortious interference with that contract, as in *NBT Bancorp*, so too a defendant with a mere expectation of investment, like North Haven, cannot invoke economic interest to excuse its own tortious interference. North Haven's non-binding term sheet with Plata, which was terminable at will, did not establish the requisite "legal or financial stake" in Plata.

In any event, both *Natale* and *American Water* are readily distinguishable on their facts. In *Natale*, the alleged tortious termination of plaintiff's employment contract occurred on October 29, 2013, *after* the relevant hospital merger had closed in July 2013. 2014 WL 5374349, at *1. And in *American Water*, though the alleged interference technically took place a handful of days before closing, there is no suggestion that the pending acquisition was contingent

in any way, such as on a shareholder vote. 2014 WL 3885953, at *1; *compare NBT Bancorp*, 664 N.E.2d at 496 ("for NBT, consummation of the Merger Agreement represented no more than a hope that Central shareholders . . . would in fact approve the transaction").[10] Neither case supports extending the economic interest defense to the sort of contingent, non-binding, terminable-at-will term sheet at issue in this case.[11]

Attempting to conflate its Term Sheet with a binding agreement, North Haven stresses two provisions that it claims "gave North Haven exclusivity" and set forth a "best efforts" provision. *See* Mot. at 8. Neither argument withstands scrutiny. First off, as noted, the Term Sheet was non-binding and allowed North Haven or Plata to walk away at any time. Indeed, North Haven threatened to walk away from the contemplated transaction altogether weeks after it signed the Term Sheet. *Supra* § I.B.; ACC ¶ 115.

[redacted] Ex. A at 6. A [redacted]

[10] The *American Water* Court actually dismissed the tortious interference claim because the plaintiff had failed adequately to plead intentional interference by the defendant. 2014 WL 3885953, at *3-4. Its finding on economic justification was therefore only hypothetical.

[11] Notably, there is not a single case that cites *American Water*, and only two cases cite *Natale*, neither of which concerns the issue of a prospective financial stake that turns into an actual financial stake. North Haven's other cases are inapposite because they are realized transactions and contracts. *Don King Prods., Inc. v. Smith*, 47 F. App'x 12, 13 (2d Cir. 2002) (addressing "a four-year, exclusive agreement"); *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 31 (S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018) ("[A]s alleged, AGC owned BI."); *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, No. 18 Civ. 4044 (VM), 2019 WL 4744220, at *9 (S.D.N.Y. Aug. 26, 2019) (applying defense to existing stockholders' interests); *Bank of New York Mellon, London Branch v. Cart 1, Ltd.*, No. 18 Civ. 6093 (JPO), 2021 WL 2358695, at *4 (S.D.N.Y. June 9, 2021) (executed indenture).

[redacted] Ex. A at 6. That "working towards" language binds only North Haven, not Plata, and imposes no "best efforts" (or even a "commercially reasonable efforts") obligation at all. The only consequence for North Haven's failure to provide such email updates, after a two-day cure period, would be the end of exclusivity.

Second, contrary to North Haven's claim, the Term Sheet did *not* include a "best efforts" provision that required the parties to expend best efforts to complete the proposed investment. The only reference to "best efforts" in the Term Sheet is a follow-on provision that allows exclusivity to be "extended by another 15-day [period] provided all parties are making best efforts to work towards Closing of the financing contemplated by this Term Sheet." *See* ACC ¶¶ 105-06. In essence, the parties could choose to continue to work towards closing based on the agreed-upon terms, but if either party opted not to continue on those terms, the only consequence was the end of exclusivity. Nothing in the Term Sheet bound either party to keep working towards consummating an investment, let alone to use their best efforts to do so.

North Haven's non-binding Term Sheet thus fails to establish a valid economic interest defense. At a bare minimum, the Court should reject that defense at this early stage because the facts as set forth in the pleading are "not sufficiently developed to show entitlement to the defense." *Hildene Cap. Mgmt., LLC*, 2012 WL 3542196, at *9 (collecting cases).[12]

---

[12] North Haven also argues that FT Partners has not pled malice or illegality (Mot. at 11). Because the economic justification defense does not apply, FT Partners need not do so. However, FT Partners respectfully reserves the right to amend its Counterclaims should such allegations prove necessary and/or discovery yields additional evidence of such wrongdoing.

## II. <u>The Amended Counterclaims State A Claim For Unjust Enrichment.</u>

FT Partners has also stated a claim for unjust enrichment. "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). North Haven does not challenge that FT Partners incurred an expense. Nor does it challenge that permitting North Haven to retain the benefits of the lucrative investment it received would be contrary to equity and good conscience.[13]

Instead, North Haven's core defense is that the existence of the Engagement Letter forecloses an unjust enrichment claim because it covers the same ground. Mot. at 16-17. That is not the law. FT Partners may bring a claim against North Haven for unjust enrichment so long as that claim does not affect the Engagement Letter's terms.

North Haven suggests the law bars all unjust enrichment claims – even against non-parties – where a contract on the subject of the claim exists. Not so. As multiple courts have acknowledged, "there is a split of authority on this point within this District." *Ghost in the Mach. Inc. v. Planned Parenthood Fed'n of Am., Inc.*, No. 22 Civ. 9270 (VSB), 2025 WL 252913, at *9 (S.D.N.Y. Jan. 21, 2025) (collecting cases). The better view is that an unjust enrichment claim against a third party can go forward when a "Plaintiff is not seeking to supplant or supplement the terms of the [] agreement to avoid her contractual commitments." *Weyant v. Phia Grp. LLP*, No. 17 Civ. 8230 (LGS), 2021 WL 5998400, at *3 (S.D.N.Y. Dec. 20, 2021); *see also TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.*, No. 19 Civ. 3283 (DLC), 2020 WL

---

[13] Having failed to make these arguments, they are now forfeited. *Kantamneni*, 2025 WL 2774088, at *8.

1322872, at *9 (S.D.N.Y. Mar. 20, 2020) ("New York law, which it appears applies here, allows an unjust enrichment claim to proceed even in the presence of a related contract, if the claim is brought against a non-signatory to that contract.").

This rule "is more consistent with precedent from the New York Court of Appeals, which recognized an unjust enrichment claim brought against a third party despite a related contract in *Bradkin* . . . and has not closed the door on such claims since." *Lee v. Kylin Mgmt. LLC*, No. 17 Civ. 7249 (JMF), 2019 WL 917097, at *2 (S.D.N.Y. Feb. 25, 2019); *see also Matthews v. Symbion Power LLC*, 130 N.Y.S.3d 246 (Sup. Ct. N.Y. C'ty 2020) ("In *Bradkin* the Court permitted a claim for unjust enrichment against a company's owner despite a written contract between the plaintiff and the company.") "By contrast, the courts in this District that have" foreclosed unjust enrichment claims where there is an underlying contract "have not relied on Court of Appeals precedent. Instead, they have generally relied on Appellate Division decisions of dubious lineage, which are not binding on federal courts in any event." *Lee*, 2019 WL 917097, at *2. Recent New York cases agree. *See, e.g., Manhattan Chrystie St. Dev. Fund, LLC v. 215 Chrystie Invs. LLC*, 212 N.Y.S.3d 598 (1st Dep't 2024) (holding that unjust enrichment claim was not "precluded by the existence of" a contract).

As with other cases where courts have allowed these claims to go forward, FT Partners is not trying to "su[e] a non-party and seek[] to enlarge [its] contractual entitlements or diminish [its] contractual duties and in effect circumvent the contractual limitations to which [it] agreed." *Weyant*, 2021 WL 5998400, at *3. FT Partners' unjust enrichment claim against North Haven has nothing to do with the Engagement Letter. Its claim is that North Haven "benefitted from [FT Partners'] actions in bringing the deal to [its] attention," *Chestnut Hill Partners, LLC v. Van Raalte*, 847 N.Y.S.2d 18, 19 (1st Dep't 2007), but "[North Haven] has not adequately

compensated plaintiffs." *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 13 (1st Dep't 1998). The success of FT Partners' claims against North Haven will have no impact on its contractual relationship with Plata under the Engagement Letter.

North Haven briefly suggests that FT Partners has failed to explain how it enriched North Haven. Mot. at 17. In support, it claims that FT Partners "merely recite[s] alleged work that FT Partners did for Plata." *Id.* (citing ACC ¶¶ 312-14). But that is wrong. FT Partners worked hard to set up a lucrative investment opportunity for North Haven. North Haven took that opportunity, but then turned around and cut FT Partners out of the very deal it had set up. As alleged in the Counterclaims, FT Partners held numerous calls with North Haven, ACC ¶ 100, introduced it to Plata's leadership, *id.* ¶ 102, and guided the development of the non-binding Term Sheet, *id.* ¶ 104. The result was that North Haven received a valuable investment opportunity through FT Partners' work. [redacted] ACC ¶ 224. North Haven does not even attempt to explain why it was not enriched by access to the billion-dollar investment opportunity it eventually accepted.

## III. <u>North Haven's Jurisdictional Argument Is Meritless and Moot.</u>

North Haven's final argument – posed in the alternative to its 12(b)(6) arguments – is that this Court should exercise its discretion to decline supplemental jurisdiction over North Haven under 28 U.S.C. § 1367(c)(4). As an initial matter, North Haven failed to articulate any "exceptional circumstances" or "compelling reasons" (as it must) for this Court to even consider declining jurisdiction. North Haven fails to identify a single case in which any court has declined to exercise supplemental jurisdiction over a third party under these circumstances. Nor could it, because, as this Court recognized at the April 7, 2026 conference, engaging conflicts counsel is a routine solution to a common situation in complex litigation. *See, e.g.*, *In re Enron*

*Corp.*, No. 02 Civ. 5638 (BSJ), 2003 WL 223455, at *7 (S.D.N.Y. Feb. 3, 2003) (finding that a motion to disqualify counsel for conflicts "fails because" among other factors "Conflicts Counsel represents the [client] with respect to all matters in which [a conflicted firm] was previously involved.").

Nevertheless, the Court need not consider this argument. Latham is withdrawing from its representation of FT Partners in this case. While the retention of conflicts counsel has already fully and appropriately avoided any conflicts and addressed any other issues raised by North Haven, Latham's withdrawal moots, and requires rejection of, North Haven's jurisdictional argument, which is premised on Latham "remain[ing] fully involved and integrated in this proceeding." Mot. at 18.

**CONCLUSION**

For the foregoing reasons, FT Partners respectfully requests that this Court deny North Haven's motion to dismiss.

Dated: New York, New York
May 18, 2026

GLENN AGRE BERGMAN & FUENTES LLP

By: /s/ *Jed I. Bergman*
Jed I. Bergman
Jonathan H. Friedman
Samantha Bennett
Samuel G. Bieler

1185 Avenue of the Americas, 22nd Fl.
New York, NY 10036
(212) 970-1600

*Attorneys for Defendants-Counterclaim-Plaintiffs Financial Technology Partners LP and FTP Securities LLC*